IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 28, 2009 Session

**WILLIAM MITCHELL**

**v.**

**MADISON COUNTY SHERIFF'S DEPARTMENT and THE MADISON
COUNTY CIVIL SERVICE COMMISSION FOR MADISON COUNTY
SHERIFF'S DEPARTMENT**

**Appeal from the Chancery Court for Madison County**
**No. 64109      Allen W. Wallace, Judge**

**No. W2009-00099-COA-R3-CV - Filed March 31, 2010**

This appeal involves the termination of a sheriff's department employee. The employee was terminated and appealed the termination to the county civil service commission. The termination was upheld by the commission, based solely on expert testimony. The employee then sought judicial review. The motion for summary judgment filed by the employer sheriff's department was granted, and the employee's petition was dismissed. The employee now appeals. We find that the expert testimony on which the commission relied is incongruent with the undisputed facts in the record. Therefore, we conclude that the commission's decision is not supported by substantial and material evidence and is arbitrary and capricious. We reverse the grant of summary judgment in favor of the employer and remand for entry of judgment in favor of the employee.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed
and Remanded**

HOLLY M. KIRBY, J, delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Barclay M. Roberts, Memphis, Tennessee, for the appellant, William Mitchell

Brandon O. Gibson, Jackson, Tennessee, for the appellees, Madison County Sheriff's Department and The Madison County Civil Service Commission for Madison County Sheriff's Department

## OPINION

### FACTS AND PROCEEDINGS BELOW

After serving as a police officer in Dallas, Texas and Memphis, Tennessee, Petitioner/Appellant William Mitchell ("Mitchell") joined the Respondent/Appellee Madison County Sheriff's Department ("Sheriff's Department") in 1985. Mitchell received numerous promotions over his nearly twenty-year career with the Sheriff's Department. At the time of his termination, Mitchell was an Assistant Chief, serving as the Director of Jail Operations, and was fourth in command of the Sheriff's Department, serving under Madison County Sheriff David L. Woolfork ("Sheriff Woolfork").

In June 2005, Sheriff Woolfork attended the National Sheriff's Association conference in Louisville, Kentucky. Also attending the conference were Assistant Chief Dan Parr ("Assistant Chief Parr" or "Parr"), Sergeant Lisa Balderrama ("Sergeant Balderrama" or "Balderrama"), Sergeant Annette Martin ("Sergeant Martin"), Chief Tommy Cunningham ("Chief Cunningham"), and Chief Cunningham's wife.

When Sheriff Woolfork returned home from the Louisville, Kentucky conference on June 29, 2005, he retrieved the mail at his house and discovered a postcard addressed to his wife. The postcard was postmarked in the last week of June 2005[1] in Louisville, Kentucky and was purportedly from Sergeant Balderrama. The handwritten note on the postcard insinuated that Sergeant Balderrama had traveled to Kentucky with Sheriff Woolfork as part of an ongoing extramarital affair.[2]

---

[1]The postmark date on the photocopy of the postcard contained in the record is illegible. However, in the petition for judicial review, Mitchell states that the postmark is dated in the last week of June 2005.

[2]The postcard reads:

> David and I are having a great time. Last year our trip to Seattle was good but this is awesome. He told me he was divorcing you Last year, but he didn't. Now he says he is again. I really Love him and all he does for me. Maybe this will help you make up his mind.
>
> Sorry it has to be this way.
>
> Lisa Balderrama

Alarmed by the postcard, Sheriff Woolfork immediately showed it to Sergeant Balderrama, who told Sheriff Woolfork that the handwriting on the postcard was not hers. Sheriff Woolfork contacted Assistant Chief Parr. Sheriff Woolfork and Assistant Chief Parr compared the signature on the postcard with a specimen of Sergeant Balderrama's signature and observed that the signatures looked similar. Sheriff Woolfork, however, did not believe that Sergeant Balderrama had any motive to send such a note.

Assistant Chief Parr then offered to contact a questioned document examiner in Canton, Ohio, with whom he was acquainted, Michael Robertson ("Robertson"), to ask him to examine the handwriting on the postcard. Prior to joining the Madison County Sheriff's Department, Assistant Chief Parr had owned and operated a security guard provider business in Ohio. Robertson operates his own private investigation business in Canton, Ohio. Assistant Chief Parr met Robertson in the course of operating his Ohio security guard business and had maintained contact with him. Sheriff Woolfork agreed with Assistant Chief Parr's suggestion and told him to contact Robertson.

As directed, Assistant Chief Parr contacted Robertson. Robertson agreed to examine the postcard. On July 2, 2005, Assistant Chief Parr faxed copies of the postcard, as well as exemplars of Sergeant Balderrama's handwriting, to Robertson. After examining these, Robertson told Assistant Chief Parr that, in his opinion, the handwriting on the postcard was not done by Sergeant Balderrama.

Robertson then agreed to examine exemplars of the handwriting of other Sheriff's Department employees to determine whether any of them may have written the postcard. Robertson asked Assistant Chief Parr to provide him with handwriting samples from employees who either attended the conference in Kentucky or had access to the Sheriff's Department personnel files.[3] As per the request, on July 4, 2005, Assistant Chief Parr faxed Robertson handwriting specimens from the following persons: Sergeant Martin, who had attended the conference in Kentucky; Amy Crowder, a former Sheriff's Department employee and a known associate of Sergeant Balderrama; Jon Broc, a former Sheriff's Department employee who had been terminated; Mitchell, and Parr himself, both of whom had had access at some point to Sheriff's Department personnel files.[4]

---

[3]Presumably, Robertson asked to see handwriting exemplars of employees who attended the Kentucky conference because the postcard was mailed from Kentucky during the conference, and asked to see handwriting exemplars from employees with access to personnel files because they would have access to Sheriff Woolfork's home address and samples of Sergeant Balderrama's handwriting.

[4]Although Chief Cunningham and Chief Cunningham's wife attended the conference in Kentucky, Assistant Chief Parr did not fax samples of their handwriting to Robertson.

The next day, on July 5, 2005, after reviewing the specimens provided via facsimile, Robertson tentatively identified Mitchell as the person whose handwriting was on the postcard. To verify this tentative identification, Robertson asked Assistant Chief Parr to provide him with original documents containing Mitchell's handwriting. Consequently, on July 7, 2005, Assistant Chief Parr drove to Ohio to deliver the postcard and documents to Robertson. Robertson photographed them and gave them back to Assistant Chief Parr, who returned to Tennessee three days later.[5]

On July 13, 2005, Sheriff Woolfork told Assistant Chief Parr that he had learned that Sergeant Neina Murphy ("Sergeant Murphy") received a similar postcard on June 28, 2005.[6] Like the first postcard, the second postcard was postmarked in the last week of June 2005[7] in Louisville, Kentucky and was purportedly from Sergeant Balderrama. It read: "Wish you were here! My man and I are partying down! this place is nice!" Assistant Chief Parr faxed a copy of the second postcard to Robertson and mailed the original to him. The record does not reflect any steps that were taken in the internal investigation beyond having Robertson examine the postcards and selected handwriting exemplars.

After examining the photographs of the original documents delivered by Assistant Chief Parr as well as the second postcard, Robertson wrote a preliminary report concluding that Mitchell wrote both postcards. On July 19, 2005, Assistant Chief Parr received Robertson's written report, and forwarded the report to Chief Cunningham.

After receiving Robertson's report on the postcards, Chief Cunningham apparently concluded that no further investigation was necessary. At that point, he delivered and read to Mitchell a Statement of Charges ("Statement"), notifying Mitchell that he was being charged with violating the Sheriff's Department Operating Procedures. The statement said:

> Notice is hereby given that you are charged with violation(s) of policy as shown below:

---

[5]Assistant Chief Parr had family living in Ohio.

[6]The record contains an undated signed statement by Sergeant Murphy stating only that she received the postcard on June 28, 2005. The statement does not indicate why Sergeant Murphy reported it or whether she had become aware of the first postcard. Sergeant Murphy's statement does not address whether she wrote the postcard.

[7]Like the first postcard, the postmark date on the photocopy of the second postcard contained in the record is illegible. In the petition for judicial review, Mitchell states that both postcards are postmarked in the last week in June 2005.

**Madison County Sheriff's Dept. Operating Procedures:**
Section III, General Rules and Regulations:
   C.  Professional Conduct and Responsibilities
      1. Standard of Conduct: Members shall not engage in any conduct which constitutes conduct unbecoming an officer or neglect of duty.
      2. Loyalty: Members shall maintain a loyalty to the Department and their associates as is consistent with the law and Departmental rules and regulations.
      11. Criticism: Members shall not publicly criticize or ridicule the department, its policies or other employees by talking, writing, or expressing in any other manner where such talking, writing, or other expression tends to impair operation of the Department by interfering with its efficiency; interfering with the ability of supervisors to maintain discipline: or having been made with reckless disregard for truth or falsity.

   Date of complaint: July 20, 2005

   The finding of the above investigation indicates that you wrote a post card that was addressed to and mailed to the home of [Sheriff Woolfork's wife] and another post card that was addressed to and mailed to the home of Sgt. Neina Murphy, forging the signature of Sgt. Lisa Balderrama on both cards.

The Statement also advised Mitchell that he had a right to a hearing, to be assisted by counsel, to have a person of his choosing as a witness, and to present evidence on his own behalf.

Mitchell had been unaware of either the postcards or the investigation until Chief Cunningham read the Statement to him. Mitchell vehemently denied the allegations in the Statement and repeatedly offered to take a polygraph test to prove his innocence. He told Chief Cunningham to "get the polygraph ready" and that he "wouldn't take a polygraph for anything but, something like this."[8] Chief Cunningham simply acknowledged Mitchell's request to take a polygraph and advised Mitchell that he was suspended without pay pending the outcome of the internal investigation. Mitchell was given no further information on the underlying facts or allegations; he was not shown the postcards and was not informed that the Sheriff's Department had consulted with a questioned document examiner. At the

---

[8]Mitchell apparently recorded the entire conversation when Chief Cunningham read the Statement to him; however the record does not contain a transcript of the recording. The record only contains an internal memo of the Sheriff's Department recounting the exchange.

conclusion of his meeting with Chief Cunningham, Mitchell's desk was emptied and he was escorted to his car.

Mitchell's pre-termination *Loudermill* hearing was held on July 27, 2005. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). Present at the hearing were Mitchell, Chief Cunningham, Mitchell's attorney, and the attorney for the Sheriff's Department. At the hearing, Mitchell was again read the charges in the Statement; he again denied them. During the hearing, for the first time, the Sheriff's Department provided Mitchell copies of both postcards. Mitchell was not informed of any other evidence supporting the charges, including Robertson's report identifying him as the person whose handwriting was on the postcards. Reviewing the postcards, Mitchell stated that he had never been to Louisville, Kentucky and had no family or friends in Louisville. Mitchell repeated his offer to take a polygraph test.

The next day, Mitchell's attorney sent the Sheriff's Department a letter expressing concern that the *Loudermill* hearing did not satisfy due process or basic notions of fairness. Mitchell's attorney noted that Mitchell was never questioned during the investigation and that he was shown the postcards for the first time at the *Loudermill* hearing. The attorney recommended that a handwriting expert be retained to review exemplars and to express an opinion on whether the handwriting on the postcards was Mitchell's handwriting.

After Mitchell's *Loudermill* hearing, Chief Cunningham recommended to Sheriff Woolfork that Mitchell be terminated. After reviewing Mitchell's personnel file[9] and the investigation report, Sheriff Woolfork concurred in Chief Cunningham's recommendation. Accordingly, on August 1, 2005, Sheriff Woolfork sent Mitchell a letter by certified mail informing him that his employment with the Sheriff's Department was terminated effective immediately. The letter advised Mitchell that he had the right to appeal the termination to the Respondent/Appellee The Madison County Civil Service Commission for Madison County Sheriff's Department ("Commission"). Mitchell filed his appeal.

In preparation for the post-termination hearing before the Commission, Mitchell hired a forensic document examiner, Thomas Vastrick ("Vastrick"), to review the postcards. Mitchell also sought discovery, arguing that his appeal proceedings were governed by the contested case provisions of the Uniform Administrative Procedures Act ("UAPA"), and thus

---

[9]Mitchell's personnel file apparently contained one complaint made in 1973 by a motorist who did not appreciate Mitchell's tone of voice when he issued a traffic citation. Mitchell's personnel file also included approximately twenty commendations. Fifteen years prior to the post-termination hearing, Mitchell received a demotion for reasons not clear in the record.

that he should be permitted to conduct discovery in accordance with the Tennessee Rules of Civil Procedure.[10]

Pursuant to this argument, Mitchell filed a motion to depose Sheriff Woolfork, and also sent the Sheriff's Department a request for production of numerous documents. His request included the County's investigative file; the factual basis of the allegations; the Sheriff's Department policies; Department files pertaining to Mitchell, Chief Cunningham, Sergeant Murphy, and Sergeant Balderrama; records reflecting the whereabouts and activities of Sheriff Woolfork, Chief Cunningham, Sergeant Balderrama, and Mitchell for the months of June and July 2005; cell phone records pertaining to Sheriff Woolfork, Sergeant Balderrama, Chief Cunningham and Mitchell for the months of June and July of 2005; and records reflecting travel expenditures by Sheriff Woolfork, Chief Cunningham, Sergeant Balderrama, and Sergeant Murphy in June and July of 2005.

The Sheriff's Department asserted that Mitchell's appeal proceedings were governed by the provisions of the Private Act establishing the Commission, which limited discovery, rather than the contested case provisions of the UAPA.[11] Consequently, the Sheriff's Department opposed the motion to depose Sheriff Woolfork and refused to produce the requested documents.

---

[10]Mitchell asserted that Tennessee Code Annotated § 27-9-114(a)(1) called for the application of the contested case provisions of the UAPA. Section 27-9-114(a)(1) provides as follows:

> Contested case hearings by civil service boards of a county or municipality which affect the employment status of a civil service employee shall be conducted in conformity with contested case procedures under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3.

T.C.A. § 27-9-114(a)(1) (2000). Under the contested case provisions of the UAPA, as provided for in Tennessee Code Annotated § 4-5-311(a), Mitchell claimed that the Commission was empowered to "issue subpoenas, effect discovery, and issue protective orders, in accordance with the Tennessee Rules of Civil Procedure" at the request of a party.

[11]The Sheriff's Department argued that section 27-9-114(a)(1) was not applicable as the Commission was not a "civil service board 'of a county.' " Instead, the Sheriff's Department argued, the provisions of the Private Act that created the Commission applied. The Private Act provides as follows:

> In any investigation conducted by the Commission, the Commission shall have the power to subpoena and require the attendance of witnesses and the production by them of books and papers pertinent to the investigation and to administer oaths to such witnesses.

Chapter 54, Private Acts of 1983, Section 9.

Mitchell then requested the same documents pursuant to the Tennessee Open Records Act.[12] The Sheriff's Department did not produce the documents in response to the Open Records Act request. Mitchell also filed a motion with the Commission to compel discovery.

In considering Mitchell's discovery requests, the Commission agreed with the position of the Sheriff's Department and held that Mitchell's ability to conduct discovery was limited. Consequently, the Commission found that it was authorized only to order the production of documents, and not authorized to compel depositions. The Commission ordered the Sheriff's Department to produce the County's investigative file; information in the County's possession relating to the factual basis of the allegations; the Sheriff's Department policies; and documents the County intended to introduce at the hearing. Mitchell's other document requests were rejected.

The Commission hearing on Mitchell's appeal was held on June 14, 2006. The Commission heard testimony from Sheriff Woolfork, Assistant Chief Parr, Mitchell, Sergeant Balderrama, Sergeant Murphy, and the expert witnesses, Robertson and Vastrick. Seven exhibits were entered into evidence, including both postcards, the internal investigation report, apparently including Robertson's report, and Vastrick's report.

Sheriff Woolfork testified at the outset of the Commission proceedings. He said that he found the first postcard in his mailbox at his home as soon as he returned from the conference in Louisville, Kentucky, and that he gave the postcard to Assistant Chief Parr. After doing so, Sheriff Woolfork said, he had "no direct involvement" in the investigation beyond "some minor conversations" with Robertson after Assistant Chief Parr contacted Robertson. Sheriff Woolfork conceded that the investigation into the postcards was "a little different than the normal investigation" because he was the complainant.[13] He stated that, ordinarily, Lieutenant Blackwell conducted such internal investigations. In this case, however, Sheriff Woolfork decided to assign the investigation to Assistant Chief Parr because Parr knew expert Robertson.

---

[12]Mitchell's Open Records Act request inadvertently cited Tennessee Code Annotated § 50-7-501, *et seq.*, which is part of the Tennessee Employment Security Law, instead of Tennessee Code Annotated § 10-7-501, *et seq.*, pertaining to public records.

[13]Asked about the fact that Mitchell was not interviewed in the course of the investigation, Sheriff Woolfork responded that a "person is not compelled to be a witness against themselves." This was puzzling, since the constitutional Fifth Amendment right against self-incrimination does not, of course, apply to employment disciplinary proceedings, and would not have prevented Sheriff Woolfork or Assistant Chief Parr from asking Mitchell about the postcards, even if Mitchell had refused to talk.

Sheriff Woolfork testified that it was his decision to terminate Mitchell's employment. He said that Robertson's report, in which he concluded that the handwriting on the postcards was Mitchell's handwriting, was the "major part" of the decision to terminate. Sheriff Woolfork said that he did not have "any idea" what Mitchell's motive would be for sending the postcards. Sheriff Woolfork conceded that he did not attend Mitchell's pre-termination *Loudermill* hearing.

On cross-examination, Mitchell's attorney began asking Sheriff Woolfork whether he had traveled to other conferences with Sergeant Balderrama, why he would choose to have a lower-level employee such as Sergeant Balderrama attend a conference instead of a more highly-ranked employee, and other questions apparently designed to determine whether Sheriff Woolfork had in fact been involved in an inappropriate relationship with Sergeant Balderrama. The attorney for the Sheriff's Department immediately objected on relevancy grounds. Although Mitchell's attorney explained that the questions were designed to show that employees other than Mitchell had reason to send such postcards, the Commission sustained the objection and would not permit the line of questioning. Mitchell's attorney then stated for the record that, had he been permitted to continue, he could have shown an inappropriate relationship between Sheriff Woolfork and Sergeant Balderrama. Likewise, Mitchell's attorney sought to place into evidence an audit by the State Comptroller finding expressly that the use of Sheriff's Department credit cards and expense accounts for Sergeant Balderrama to attend the Louisville, Kentucky conference had been found by the auditors to be contrary to policy, because she attended the conference for "personal reasons" and had no business there. The Sheriff's Department attorney again objected, and the Commission excluded the evidence, finding that it was not relevant.

Assistant Chief Parr testified next. He said that, even though Lieutenant Blackwell normally conducted internal investigations, Sheriff Woolfork contacted him when he received the first postcard. Assistant Chief Parr immediately mentioned to Sheriff Woolfork that he knew expert Robertson, and Sheriff Woolfork told him to contact Robertson and obtain an opinion from him on whether the handwriting on the postcard was by Sergeant Balderrama. When Robertson concluded that Sergeant Balderrama did not write the postcard, Parr said, he discussed the circumstances surrounding the first postcard with Robertson. After that, Parr said, Robertson began "leading the investigation," telling Parr to send him handwriting samples from persons who had attended the Kentucky conference and persons with access to personnel files. Parr was questioned at length about the depth of his investigation:

> Q:    All right. I think you also testified that he [Robertson] suggested
>        anybody . . . that might have had access to personnel files; is that right?
> A.    Right.
> Q:    In fact, the personnel files are kept in your office, aren't they?

A:    Right.

Q:    And, in fact, Chief Mitchell has not been around the personnel files in
      well over a year; is that right?

A:    Correct.

* * *

Q:    Did it ever occur to you to go outside of Mr. Robertson in investigating
      these charges, I mean, to look to other factors besides simply the
      handwriting expert?

A:    . . . [T]o answer your question, no.

Q:    . . . [T]he sheriff had made some suggestion that Mr. Robertson was the
      one that . . . set out the scope of the investigation, but your testimony
      is that you were in charge; is that right?

A:    Well, I'd go with Mr. Robertson.  I mean, this just hap - - - unfolded as
      it came along.

* * *

Q:    You never interviewed Chief Mitchell, did you?

A:    No.

Q:    Did you ever check any attendance records to see where Chief Mitchell
      was in the last week of June?

A:    No.

Q:    Would it surprise you if you found out that, in fact, he was at the jail
      working?

A:    No.

Q:    Did you ever consider the fact that Chief Mitchell would have [had] no
      opportunity to mail postcards from Louisville, Kentucky?

A:    No.  I didn't take that into consideration whether he mailed them or not.

Q:    And why did you think that it was someone inside the
      department as opposed to somebody outside the department?

A:    I just went by somebody that might, you know, have access or inside
      knowledge.

Q:    Okay.  Was that because Mr. Robertson was the one that suggested
      that?

A:    Yes.

Q:    Did you ever try to take a look at what kind of motive somebody might
      have had for sending these postcards?

A:    No.

Thus, Assistant Chief Parr acknowledged that Robertson, in Ohio, was in effect driving the investigation, and directed Parr to forward him handwriting samples from employees with access to the personnel files.  Mitchell's sample was included even though Mitchell had not

-10-

had access to the personnel files for over a year. Presumably Parr did not expand the investigation because Robertson did not tell him to do so. Parr did not interview Mitchell, did not check Mitchell's attendance records, did not consider whether Mitchell was at the jail working the day the postcards were mailed, and did not consider whether Mitchell in fact mailed the postcards. Assistant Chief Parr also said he never looked into motives someone may have had for sending such postcards. That concluded the testimony of Assistant Chief Parr.

As the final witness in its case in chief, the Sheriff's Department called Robertson as an expert witness. At the outset of his testimony, Robertson was questioned at length about his qualifications. Robertson described himself as a questioned document examiner and a fraud investigator. He said that he worked for seventeen years as a Special Agent in the U.S. Secret Service and received in-house training with the Secret Service and the U.S. Treasury Department. The Secret Service in-house training, he said, was a four-week course. Roberts said that questioned document examination encompasses handwriting analysis as well as examination of "other areas such as . . . paper folds, staple holes in paper, . . . work with computer processing and the like" to determine the authenticity of a document. After leaving the Secret Service, Robertson said, he continued to work in private practice for nearly eighteen years. Robertson was familiar with and relied on leading textbooks in the field of forensic document examination, but admitted that he was not a member of any professional organization in the field. Robertson maintained that he had been qualified as an expert witness in questioned document examination on numerous occasions. The Commission allowed Robertson to testify as an expert witness.[14]

Thereafter, Robertson offered his opinion on the identity of the person whose handwriting was on the postcards. Robertson said that he first looked at a fax copy of the postcard and a fax copy of Sergeant Balderrama's signature and concluded that the postcard signature was not genuine and looked "laborious" or even traced. He then asked Assistant Chief Parr to send him handwriting samples from persons who would have had the information necessary to send the postcards, namely, Sheriff Woolfork's home address, knowledge that he and Sergeant Balderrama attended the Kentucky conference, access to Sergeant Balderrama's signature, and also persons who attended the Kentucky conference. After receiving the copies of the handwriting exemplars from Parr, Robertson compared them to the copies of the postcards. Robertson first explained the letter-by-letter manner in which he had examined the postcards and the known exemplars. He observed that there were many similarities and many differences between the handwriting on the postcards and Mitchell's

---

[14]Mitchell's attorney did not object to the tender of Robertson as an expert, but remarked: "Your Honor, I think that when I put my -- our expert on that you'll see that, in fact, Mr. Robertson is not a qualified expert on questioned document examination."

exemplars. However, based on the content of the postcards, Robertson surmised that the person who wrote the postcards had an intent to disguise. On that basis, Robertson said, he attributed the differences between the postcards and Mitchell's handwriting as the writer's attempt to disguise:

> Q:    . . . [I]t sounded to me that when you were pointing out similarities, . . . the differences you wrote off as disguise; is that correct? There are a lot more differences than there are similarities in these samples that we looked at?
>
> A:    Yes.
>
> Q:    So you're writing a lot of this off as being disguise?
>
> A:    I'm writing off – I'm writing off quite a bit as disguise, but . . .. I'm saying that even though there was a lot of disguise, that there are a lot of identifying characteristics.

Robertson's opinion, to a reasonable degree of certainty, was that the handwriting on the postcards in question was by Mitchell.

Robertson noted that his report to Assistant Chief Parr was a "preliminary" report that anticipated doing a final report that would "include investigative factors that support this document examination opinion." The "investigative factors" would include information that was important, such as the dates of the Kentucky conference and the like; however, Robertson was never furnished any further information and consequently never issued a final report.[15] Robertson's testimony concluded the case in chief by the Sheriff's Department.

Mitchell then testified on his own behalf. After reiterating that he had nothing to do with the postcards, Mitchell described the events leading up to his termination. He first learned of the postcards, he said, when Chief Cunningham came to his office, told him he was suspended pending an investigation, and read the Statement of Charges to him. At that time, he did not actually see the postcards. Mitchell said that Chief Cunningham would not answer his questions, not even to furnish the dates on which the postcards were sent; he simply emptied out Mitchell's desk and walked him to his car. Mitchell offered to take a polygraph test to alleviate any suspicion that he was involved with the postcards; however, he was never given a polygraph. Mitchell maintained that he was never interviewed during the course of the entire investigation. He was never even shown copies of the postcards or given any details about them, he said, until his *Loudermill* pre-termination hearing at the office of the attorney for the Sheriff's Department.

---

[15]Robertson later redacted the language pertaining to "investigative factors" from the preliminary report and informed the Sheriff's Department that it was his final report.

-12-

Mitchell testified that, for about a year before his termination, he had been the Director of Jail Operations. As such, his office was in a separate complex from Sheriff Woolfork, and he saw Sheriff Woolfork only occasionally, when Sheriff Woolfork came to the jail. Mitchell testified:

> A:    . . . I[ve] never been to Louisville, Kentucky. I don't have any friends in Louisville, Kentucky. I don't have any relatives in Louisville, Kentucky. There's absolutely no reason that you would find me in Louisville, Kentucky. . . .
>
> Q:    . . . [Y]ou didn't attend the [Louisville, Kentucky] conference?
>
> A:    I've never attended any conferences.
>
> Q:    Where were you the last week of June 2005?
>
> A:    . . . I was working at my assignment at the criminal justice center.
>
> Q:    Did you know that Sheriff Woolfork was at the conference in Louisville?
>
> A:    No, sir. I'd had no way of – I'd had no way of knowing that. I had been [a]way from post, if you will, assigned to the jail for almost a year.

Mitchell maintained that he had nothing to do with either writing or mailing the postcards.[16] On cross-examination, Mitchell conceded that he did not make arrangements to take and pay for a polygraph test himself, in order to exonerate himself.

Mitchell called Sergeant Balderrama to testify. Sergeant Balderrama described her position with the Sheriff's Department as a sergeant in court security. She acknowledged attending the Kentucky conference, and said that she did not see Mitchell when she was there. As soon as they returned from the conference, she said, Sheriff Woolfork showed her the postcard and asked her if she had written it. She told him no. Sergeant Balderrama said that no one else interviewed her about the postcards.

Mitchell's attorney sought to question Sergeant Balderrama about other conferences she had attended with Sheriff Woolfork, including a conference in Seattle referenced on one of the postcards, and also to question her overall about her relationship with Sheriff Woolfork and

---

[16]As to any issues Mitchell had with Sheriff Woolfork, Mitchell said that he could recall one occasion on which he jokingly answered the telephone, "Sheriff Mitchell," and he and Sheriff Woolfork had a humorous conversation in which Sheriff Woolfork laughed and said, "[O]h, you are running for sheriff" and Mitchell said he was not. About two years prior to his termination, Mitchell said, after an audit, he suggested to Sheriff Woolfork that he consider changes to travel and credit card policies.

her motivation to write the postcards. The attorney for the Sheriff's Department again objected on grounds of relevancy, and the Commission sustained the objection.[17]

Mitchell called Sergeant Murphy, who received the second postcard from Kentucky in the mail on June 28, 2005. When she received the postcard, Sergeant Murphy said, she did not tell Sheriff Woolfork about it, but instead told Sergeant Martin. Sergeant Murphy was asked about other events on the same day she received the postcard:

> Q:  And that's the day [June 28, 2005] that ultimately Chief Mitchell tried to discipline you for disappearing off the premises without telling him and not submitting to a drug test and not confessing to an accident; is that correct?
> A:  I don't recall.
>
> * * *
>
> A:  I do remember being in the car – car accident, but the other statement you mentioned, I don't remember.
> Q:  Do you remember the chief [Mitchell] later accusing you of not – of leaving without telling him?
> A:  Not verbatim.
>
> * * *
>
> Q:  . . . So there's no correlation to the fact that you found this . . . postcard in your post office box the same day as you got in some trouble with [Mitchell]? And that's just a coincidence?
> A:  I don't recall.
>
> * * *
>
> Q:  In fact, . . . Chief Mitchell's written you up several times in the past, hasn't he?
> A:  Yeah.
> Q:  So you didn't make any phone calls to the sheriff when you received the – this postcard?
> A:  I do remember Sergeant Martin.

Sergeant Murphy acknowledged, then, that on the day she said that she received the postcard, she was in a car accident and Mitchell admonished her for leaving without telling him, and that Mitchell had previously disciplined her on several occasions. She admitted that when she learned that Mitchell had been suspended, she laughed and shouted, "I won, I won" so much that she was sent home from work.

_____

[17]Mitchell's attorney stated for the record that, had he be allowed to continue, he would have shown that Sergeant Balderrama attended a conference in Las Vegas with Sheriff Woolfork.

Sergeant Murphy testified that she was never asked to submit a handwriting sample.[18] She only submitted a statement to Lieutenant Blackwell.[19] Sergeant Murphy acknowledged that she was not asked to attend the Louisville, Kentucky conference with Sheriff Woolfork. When Mitchell's attorney asked her about attending a conference in Las Vegas with Sheriff Woolfork, the Commission again precluded Mitchell's attorney from inquiring about it.

As his final witness, Mitchell called forensic document examiner Thomas Vastrick. In his testimony, Vastrick demonstrated in detail his methodology and the letter-by-letter comparison he had conducted, comparing the postcards with Mitchell's handwriting exemplars. Vastrick observed that there were many similarities and many differences between the two, and found both the similarities and the differences to be significant. Vastrick opined, "I cannot identify Mr. Mitchell as having written the printing on the postcards, but neither can I eliminate him," explaining that the postcards and Mitchell's exemplars simply did not provide a basis for identifying or eliminating Mitchell as the person who wrote the postcards. Vastrick said that a person's handwriting can be affected by external factors such as drugs or mental upset. He commented that persons have been known to "trace" their own signature, with the intent to later disclaim having signed the document. He explained: "The only way that you can eliminate someone is you have to be able to say . . ., there is no way under any circumstances the person could have done this. . . . We're not going to fully eliminate people very often. It very rarely happens." Vastrick was asked about Robertson's opinion, attributing the differences between the handwriting in Mitchell's exemplars and the handwriting on the postcards to intent to disguise:

> A:    I cringed when I heard that. For one thing there was – there was no physical evidence of disguise. . . . This was not a disguise. These are differences.
>
> * * *
>
> You cannot tell intent of the writing. . . . We're looking at physical evidence. You cannot tell that intent from handwriting.

The parties put on no further witnesses, and the Commission took the matter under advisement.

On June 21, 2006, the Commission sent a letter to the parties affirming the termination of Mitchell's employment. In the letter, the Commission commented: "Certainly, the decision

---

[18]Expert Robertson was not furnished a sample of Sergeant Murphy's handwriting.

[19]The statement signed by Sergeant Murphy said only that she received the postcard on June 28, 2005. It did not address whether she wrote either postcard, or any possible reason why the postcard was sent to her.

. . . must be determined by the testimony of the opposing handwriting experts." The letter then summarized the experts' testimony as follows:

> Mr. Robertson, the handwriting expert testifying for Sheriff Woolfork, stated unequivocally that Mr. Mitchell is, in fact, the author of both postcards. Mr. Vastrick, testifying for Mr. Mitchell, stated that there were many similarities and many differences between the handwriting sample of Mr. Mitchell and the handwriting found on both postcards. Mr. Vastrick went on to testify that there was simply not enough evidence to make a determination either way.

The Commission then affirmed the termination of Mitchell's employment "[a]fter consideration of the proof in this case and a review of the Sheriff's Department Operating Procedures Manual."

On August 18, 2006, Mitchell filed a petition for writ of certiorari, or, in the alternative, for judicial review of the Commission's decision, in the Madison County Chancery Court ("trial court"). The petition named as respondents the Sheriff's Department and the Commission (collectively, "County"). In the petition, Mitchell asserted that the Commission's decision constituted an abuse of discretion, was unsupported by substantial and material evidence, and was arbitrary, capricious, illegal, in excess of the Commission's authority, and made on unlawful procedure.

The County then filed a motion for summary judgment.[20] After a hearing, the trial court entered an order granting the County's motion and dismissing Mitchell's petition. Mitchell now appeals.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

Mitchell raises the following issues on appeal:

1) Whether the Commission's decision was in violation of Constitutional and statutory provisions and/or was made upon unlawful procedure by holding that Mitchell's pre-termination hearing was a "meaningful hearing" that comports with his Constitutional due process guarantees, by failing to act in accordance with the contested case provisions of the UAPA or the disclosure provisions of the Tennessee Open Records Act, and by crediting Robertson's testimony as a handwriting expert;

---

[20]The record does not contain an answer filed by the County.

-16-

2) Whether the Commission's decision was arbitrary, capricious, and/or characterized by an abuse of discretion, by ignoring significant deficiencies in the way that the investigation against Mitchell was conducted, by refusing to consider evidence that exonerates Mitchell or suggests the guilt of others, and/or by mis-characterizing the testimony of the experts; and

3) Whether the Commission's decision was unsupported by substantial and material evidence by upholding Mitchell's discharge solely on the basis of Robertson's testimony.

On appeal, we utilize the same standard of review used by the trial court in reviewing the Commission's decision. *See Penny v. City of Memphis*, 276 S.W.3d 410, 417 (Tenn. Ct. App. 2008) (citing *CF Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980)). Under Tennessee Code Annotated § 27-9-114(b)(1), "[j]udicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322." T.C.A. § 27-9-114(b)(1) (2000); *accord Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 262-63 (Tenn. 2009); *City of Memphis v. Civil Serv. Comm'n.*, 216 S.W.3d 311, 315 (Tenn. 2007). Section 4-5-322(h), in turn, states:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

T.C.A. § 4-5-322(h) (2005); *accord Davis*, 278 S.W.3d at 262. The statute cautions: "In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." T.C.A. § 4-5-322(h)(5)(B) (2005).

-17-

We consider first whether the Commission's decision is arbitrary and capricious under Tennessee Code Annotated § 4-5-322(h)(4). Mitchell argues that the Commission's decision is arbitrary and capricious for several reasons. First, he contends that his *Loudermill* pre-termination hearing was perfunctory and gave him little information about the basis for the charges against him. He also argues that he was not permitted basic discovery necessary to mount a defense. At the Commission hearing itself, Mitchell argues, he was precluded from introducing exculpatory evidence, for example, evidence pointing to the motives of others to send the postcards in question. Mitchell questions Robertson's qualifications as an expert and argues that the Commission should not have considered his testimony. He maintains that the investigation on which the charges were based was fatally deficient. Finally, Mitchell contends that the Commission failed to consider the exculpatory evidence he was permitted to introduce, including his own lack of access to the personnel files and the motivation of others such as Sergeant Balderrama or Sergeant Murphy to send the postcards.

In response, the Sheriff's Department argues that Robertson's expert testimony, deemed credible by the Commission, constitutes substantial and material evidence to support the Commission's decision. It argues that Mitchell did not object in the Commission proceedings to Robertson's testimony as an expert, and thus cannot raise the issue on appeal.

A decision that is not supported by substantial and material evidence is necessarily arbitrary and capricious. *Miller v. Civil Serv. Comm'n*, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008) (citing *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007)). Our Supreme Court has explained: "An arbitrary [or capricious] decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *City of Memphis*, 216 S.W.3d at 316 (quoting *Jackson Mobilephone Co., Inc. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993)) (brackets added in *City of Memphis*). We consider, then, whether the Commission's decision in this case was supported by substantial and material evidence, and thus whether it was arbitrary or capricious.

On appeal, the "substantial and material evidence" test is not to be applied mechanically:

> In its broadest sense, the standard requires the court to determine whether the administrative agency has made a clear error in judgment.. . .
> . . .[T]he court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational mind might accept to support a rational conclusion." . . . The

evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.

*Id.* at 316-17 (quoting ***Jackson Mobilphone Co., Inc.***, 876 S.W.2d at 110-11). As stated plainly in the statute, "in determining the 'substantiality' of the evidence, this Court may consider evidence in the record that fairly detracts from its weight, but we are not to substitute our judgment for that of the agency concerning the weight of the evidence." ***Penny***, 276 S.W.3d at 418 (citing T.C.A. § 4-5-322(h)(5)(B); ***Pace v. Garbage Disposal Dist.***, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965)). Therefore, we consider the evidence in the administrative record in light of this standard.

The Sheriff's Department argues that Mitchell failed to object to the Commission's acceptance of Robertson as an expert, and is, therefore, precluded from raising this as an issue on appeal. We agree. *See **Farver v. Carpenter***, No. E1999-01840-COA-R3-CV, 2000 WL 816820, at *3 (Tenn. Ct. App. June 23, 2000), *perm. app. denied* Jan. 8, 2001 (citing ***State v. Killibrew***, 760 S.W.2d 228 (Tenn. Crim. App. 1988); ***Bowman v. State***, 598 S.W.2d 809 (Tenn. Crim. App. 1980)).

The Sheriff's Department also notes that the Commission credited Robertson's expert testimony, and argues that this Court on appeal is required to give great deference to the Commission's determination of the credibility of the witnesses. We agree with this contention as well. ***City of Memphis v. Civil Serv. Comm'n.***, 239 S.W.3d 202, 208 (Tenn. Ct. App. 2007); ***City of Memphis v. Civil Serv. Comm'n***, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007); ***Pruitt v. City of Memphis***, No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005).

How, then, is the substantial and material evidence test applied under these circumstances? The Sheriff's Department contends, in essence, that once this Court recognizes that the Commission credited Robertson's testimony over Vastrick's testimony, and finds that Robertson's testimony is substantial and material, it need go no further. We respectfully disagree. Such an approach would be clearly contrary to the plain language in the statute, which directs the Court to consider the evidence in "the entire record," including "whatever in the record fairly detracts from its weight." T.C.A. § 4-5-322(h)(5)(A), (B) (2005). However, we are not permitted to reverse an administrative decision that is supported by substantial and material evidence "solely because the evidence could also support another result." ***Martin v. Sizemore***, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001) (citing ***Hughes v. Bd. of Comm'rs***, 319 S.W.2d 481, 484 (Tenn. 1958); ***Metro. Gov't v. Tenn. Solid Waste Disposal Control Bd.***, 832 S.W.2d 559, 561 (Tenn. Ct. App.1991)). The Commission's factual findings may be rejected "only if a reasonable person would necessarily draw a

different conclusion from the record." *Id*. (citing *Jones v. Greene*, 946 S.W.2d 817, 828 (Tenn. Ct. App. 1996)).

In making the factual finding that Mitchell was in fact responsible for the postcards sent to Sheriff Woolfork's wife and to Sergeant Murphy, the Commission relied expressly upon Robertson's expert testimony. No other evidence was specifically mentioned in the letter relaying the Commission's decision. We look, then, at the basis for Robertson's testimony and at the other evidence in the record.

For reasons that are not made explicit in the record, the investigation of the postcard offense was handled in an atypical manner. Instead of casting a wide net initially to consider any persons, employee or otherwise, who might have reason to send such postcards, and conducting interviews and other investigation to determine both motive and opportunity, the investigation was assigned to Assistant Chief Parr, who immediately handed it over to Robertson, in Ohio. By all accounts, after Robertson opined that the postcards were not signed by Sergeant Balderrama, Robertson suggested that Assistant Chief Parr obtain handwriting samples from employees who would have had some opportunity to either send the postcards from Louisville, Kentucky or obtain the information on the postcards, *i.e.*, Balderrama's signature and the home addresses of Sheriff Woolfork and Sergeant Murphy. The samples Robertson was given were incomplete and, indeed Robertson was given exemplars from some persons who fit into neither category. For example, Chief Cunningham and his wife attended the Kentucky conference, but samples of their handwriting were not included. Mitchell did not attend the Kentucky conference and had not had access to Sheriff's Department personnel files for over a year, and yet his exemplar was forwarded to Robertson. Inexplicably, no exemplar of Sergeant Murphy's handwriting was sent to Robertson for comparison, despite the fact that she said that she received a postcard and ostensibly reported receiving it to Sergeant Martin, who had attended the Kentucky conference.

On the basis of the information furnished to him, Robertson issued a "preliminary" report, identifying Mitchell as the person whose handwriting was on the postcard. Robertson's preliminary report indicates that, at the time it was written, he anticipated issuing a final report that would "include investigative factors that support [his] document examination opinion."[21]

---

[21]For reasons that are not apparent in the record, Robertson's preliminary report of July 19, 2005, containing the quoted language, is not in the appellate record. Rather, the record contains a July 25, 2005 version of Robertson's report that omits the quoted language. However, in the hearing before the Commission, Mitchell's attorney questioned Robertson about the July 19, 2005 report, specifically quoting this language,

(continued...)

In this case, however, there were no other "investigative factors." Indeed, the record does not even indicate any other investigation. Assistant Chief Parr, disclaiming responsibility for the investigation, does not indicate that he interviewed *anyone*;[22] not Sergeant Balderrama,[23] not Sergeant Murphy, and certainly not Mitchell. He admitted not even investigating whether Mitchell was on duty in the jail complex on the date the postcards were mailed from Kentucky, and professed unconcern when informed in the Commission hearing that Mitchell was at the jail that day. There was no investigation into motive for sending such postcards, such as whether Sheriff Woolfork in fact had an inappropriate relationship with Sergeant Balderrama, Sergeant Murphy, or any other person, employee or not. Mitchell was foreclosed from probing into such matters, despite the obvious relevance to an offense of this nature. Thus, the "investigative factors" that would have permitted Robertson to put into context his preliminary identification of Mitchell as the person who wrote the postcards were never furnished to Robertson.

We look, then, at Robertson's expert testimony in light of the record as a whole, to determine whether the Commission's decision is supported by substantial and material evidence. In addition to Robertson's preliminary identification, the undisputed evidence in the record shows that (1) Mitchell did not attend the Louisville, Kentucky conference, and was on duty at the Madison County jail complex on the day the postcards were mailed from Kentucky; (2) Mitchell did not know anyone in Louisville, Kentucky; (3) Mitchell had not been in a position to have access to the Sheriff's Department personnel files for almost a year; and (4) Mitchell's office was in a separate complex from Sheriff Woolfork and he did not know Sheriff Woolfork's comings and goings, and specifically did not know that Sheriff Woolfork had attended the Kentucky conference. Moreover, both Sheriff Woolfork and Assistant Chief Parr testified that they had "no idea" of why Mitchell would mail such postcards to Mrs. Woolfork and to Sergeant Murphy.

Therefore, for the Commission to make a factual finding that Mitchell caused the postcards to be sent to Mrs. Woolfork and Sergeant Murphy, it would have to have concluded that Mitchell obtained the necessary personal information (the home addresses of Sergeant

---

[21](...continued)
and Robertson acknowledged in his answer that the prior version of the report contained the quoted language.

[22]We cannot know from the record whether Assistant Chief Parr refrained from such investigation because it would have required inquiries of a personal nature related to his supervisor, Sheriff Woolfork.

[23]Sergeant Balderrama's testimony indicates only that she was asked by Sheriff Woolfork, on the day he received the postcard, whether she wrote it, which she denied. There is no indication that Assistant Chief Parr or anyone else questioned Sergeant Balderrama or asked her who would have reason to sign her name to such postcards.

Murphy and Sheriff Woolfork, a copy of Sergeant Balderrama's signature) a year earlier, ascertained surreptitiously in advance that Sheriff Woolfork would attend the conference in Louisville, Kentucky with Sergeant Balderrama, befriended an unknown person in Louisville, Kentucky, wrote both postcards and forged Sergeant Balderrama's signature on them in advance, sent the postcards to the unnamed confederate in Louisville, Kentucky, and had the accomplice mail them from Kentucky, while the conference was underway, to Mrs. Woolfork and to Sergeant Murphy, whom he had repeatedly disciplined for work-related infractions. We find that these undisputed facts in the record "fairly detract" from the weight accorded by the Commission to Robertson's opinion testimony. T.C.A. § 4-5-322(h)(5)(B) (2005).

In light of the overall evidence, we must find that "a reasonable person would necessarily draw a different conclusion from the record." *Martin*, 78 S.W.3d at 276 (citing *Jones*, 946 S.W.2d at 828). In short, "it is our conclusion that even under a limited scope of review, these facts warrant a result contrary to that of the Commission." *City of Memphis*, 216 S.W.3d at 317 (citing *Martin*, 78 S.W.3d at 276). Thus, we hold that the Commission's factual finding that Mitchell was responsible for the postcards at issue is not supported by substantial and material evidence. Consequently, the Commission's affirmation of the termination of Mitchell's employment must be deemed arbitrary and capricious. Accordingly, we must reverse the trial court's grant of summary judgment in favor of the Sheriff's Department and remand the case to the trial court with directions to enter judgment in favor of Mitchell.

This holding pretermits all other issues raised on appeal.

## CONCLUSION

The decision of the trial court is reversed, and the case is remanded to the Chancery Court of Madison County for entry of judgment in favor of Appellant William Mitchell. The costs of this appeal are taxed to the Appellees Madison County Sheriff's Department and the Madison County Civil Service Commission for the Madison County Sheriff's Department, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE