IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 26, 2024

## TAURICK BOYD v. CITY OF MEMPHIS ET AL

**Appeal from the Chancery Court for Shelby County**
**No. CH-19-0965     JoeDae L. Jenkins, Chancellor**

_____

### No. W2023-01109-COA-R3-CV

_____

Appellee's employment as a City of Memphis Firefighter was terminated based on an offensive post to Appellee's Facebook page. After receiving notice of his termination, Appellee requested an appeal hearing with the City of Memphis Civil Service Commission. Following the hearing, the Commissioner issued a decision affirming the termination, and Appellee sought review in the trial court. The trial court reversed the Commissioner's decision, finding that substantial and material evidence did not support the decision, and that the decision was arbitrary and capricious and made in violation of Appellee's right to equal protection. The City of Memphis appeals. We vacate the trial court's decision reversing the Commission's termination of Appellee's employment. The case is remanded to the trial court for entry of an order vacating the Commissioner's decision and ordering further proceedings in compliance with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Tannera G. Gibson, City Attorney, and Sharon L. Petty, Senior Assistant City Attorney, for the appellants, City of Memphis, and City of Memphis Civil Service Commission.

Darrell J. O'Neal and Misty L. O'Neal, Memphis, Tennessee, for the appellee, Taurick Boyd.

# OPINION

## I. Background

Appellee Taurick Boyd was employed by the City of Memphis ("City") Fire Department ("MFD") as a Fire Private. At the time of the termination of his employment, Private Boyd had been with the MFD for approximately 19 years. Prior to the charges giving rise to the termination of Private Boyd's employment, he was suspended three times for the following infractions: (1) 360 hours for violating the substance-abuse policy in 2015; (2) 144 hours for being charged with domestic abuse and being noncompliant with the recommendations he was given under the Formal Management Referral process in 2013; and (3) 96 hours for leaving his post while on duty in 2001.

On May 23, 2017, Private Boyd was served with a Notification of Administrative Investigation and Hearing, which charged him with violation of various sections of the Division of Fire Services Operations Manual Volume 100 Rules and Regulations ("MFD Rules") and the City of Memphis Personnel Manual Policies and Procedures ("PM"). Following an administrative hearing on May 24, 2017, Private Boyd's employment was terminated by letter of June 2, 2017. Termination of his employment, effective June 7, 2017, was based on several alleged violations of the MFD Rules and the PM. As set out in the termination letter:

> On April 26, 2017, you entered a private room on Facebook called Pettyville. According to your testimony, this is an adult room where adult humor is shared. You stated that you pulled a picture off another Facebook private room that you could not remember the name of. This picture displayed a condom displaying a red substance on it that you said represented blood. There was a caption under the picture that sated "when girl scouts are better than the cookies." When asked by another person why use a condom you stated "Fuck go Raw." This instantly created a fire storm of negative comments aimed at your posts and comments. Shortly afterwards calls were received by the City of Memphis concerning your Facebook post. Complaints were sent to Local News Stations, the Memphis Fire Department Facebook site and Child Services. Lieutenant Harold Kelly called you at home due to you being on vacation and ordered you to remove the Facebook post. Due to the nature of the alleged Facebook post, you were placed on alternative duty while the incident was under administrative investigation.

> The Memphis Police Department (MPD) was contacted due to the nature of the Facebook posts at the request of the Memphis Fire Department to investigate the incident. The MPD Inspectional Services Bureau completed a report on the incident and sustained that both City of Memphis Personnel Policies and Procedures and Memphis Fire Department Division Rules and

- 2 -

Regulations had been violated by your actions.

Due to this incident and based upon the facts presented above, you were charged with violating the Division of Fire Services Operations Manual Articles listed below:

**Division of Fire Services Operations Manual Volume 100 Rules and Regulations**:

Conduct:      Section 102.01      Page: 2      Paragraph: 9
Members shall not exhibit conduct either on or off duty that is in breach of public trust.

Conduct:      Section 102.01      Page: 2      Paragraph: 10
Members shall not exhibit conduct, either on or off duty, which could be considered unbecoming a member of the Fire Division or City of Memphis.

Discipline:   Section 103.01      Page: 3      Paragraph:   11   Major Violations
P) Repeat violations
S) Conduct unbecoming a member of the Memphis Fire Department or City of Memphis.

**City of Memphis Personnel Manual Policies and Procedures, as shown below**:

PM 30-01,   Section 30-00,      Page 26,      Paragraph 1 (in part reads)
City employees, as integral members of the City of Memphis Government, shall adhere to acceptable business principles in matters of personal conduct and behavior and must exhibit a high degree of personal integrity.  City employees refrain from any conduct that might or could be viewed unfavorably by the public at large.  Therefore, City employees are expected to behave in a professional manner by conducting themselves in a way that best represents City Government and to exercise appropriate conduct and judgment at all times.

PM 38-02,   Section 38-00,      Page 2,      Paragraph 17
The employee has either on or off the employee's regular duty hours engaged in employment activities, or enterprises that are inconsistent, incompatible, or in legal, technical, or moral conflict with the employee's assigned duties, functions, and responsibilities.

PM 62-27,   Section 62-00,      Page 1,      Paragraphs 3 and 4

All employees are responsible for maintaining the City's positive reputation and presenting the City in a manner that safeguards its reputation, employees, managers and shareholders. In general, employees who participate in social media are free to publish their own personal information without censorship by the City subject to this policy and other applicable City policies, rules, regulations and guidelines. However, the official spokesperson for the City is the Mayor's Communications Office. Employees are prohibited from acting as a spokesperson for the City or posting comments as a representative of it.

If an employee chooses to identify him or herself as a City employee on any social media, he or she must state in clear terms that the views expressed are the employee's alone and that they do not reflect the views of the City.

***

The Administrative investigation revealed that you had placed the picture and comments on Facebook. You stated that you thought it was funny and did not understand why people were so upset about it. You did state that you received messages from people on the website asking for its removal. One person even posted the picture on your personal page where your daughter saw it. She notified you of the posting according to your testimony.

You were given ample time to read the Inspection Services Bureau (ISB) report compiled by the Memphis Police Department. You stated that you had no questions. You stated that the information contained in the evidence was accurate and correct.

During the Administrative Hearing, you were asked to explain the circumstances of your actions. You stated that you are a member of different private groups on Facebook. Some of these are adult only type groups where adult humor and sexual topics are discussed. You located this photograph and thought it would be viewed as funny by other people in the room called Pettyville. You really do not understand why people were offended by this post. You did not state or act remorseful for your act but thought it was ok to display such a post in a private room. You repeatedly stated that you don't understand why everyone got so upset. You compared yourself to Red Foxx. This was your attempt to tell a dirty joke that brought outrage by the members of this grounp you are a member of. You were asked did your Facebook page identify you as a Memphis Firefighter and you stated that it did not now but had in the past. There were pictures of you in your Memphis fire Department uniform on your page as well.

- 4 -

***

Considering the facts of the case and the preponderance of evidence reflects your poor judgment and decision that was made that day. You not only exhibited conduct that would breach the public's trust but you exhibited conduct that brought negative attention to both the City of Memphis and the Memphis Fire Department. As a public servant, you are held to [a] standard of excellence that is expected by the Memphis Fire Department and the City of Memphis. As a result, it is my decision with the concurrence of the Investigative Committee that you shall be terminated. . . .

Your actions brought embarrassment to the City of Memphis, Memphis Fire Department, to your family, and to you. You must realize that we are a public agency charged with the responsibility of providing emergency services that are vital to the efficient and effective operation of the City of Memphis government. As such, public servants must hold ourselves to a standard of excellence in service that the Citizens of Memphis and the public deserve and expect. When members fail to exert the authority vested in them to uphold the standards of the Division of Fire Services written or unwritten, we deprive the citizens of the expected service they deserve.

Private Boyd appealed the termination of his employment to the Civil Service Commission ("Commission," and together with the City, "Appellants"). Commissioner Stephen H. Biller heard the matter on March 11, 2019. As set out in the Commissioner's May 29, 2019 order,

[Mr.] Boyd's defense and the basis of his request for reinstatement and back pay is predicted on his comparison to three (3) current or former fireman [,*i.e.*, Lieutenant Robert Kramer, Lieutenant Maurice Tolliver, and Private Christopher Lurhs] who allegedly violated the social media policy who were not terminated and because he cooperated during the investigation, apologized, and allegedly took down the post (Re-post) before being asked to do so, and because he had been employed for some nineteen (19) years and he did not want to throw those years away because of his poor judgment.

The Commissioner was not swayed by Private Boyd's defense and held that, although Lieutenant Kramer, Lieutenant Tolliver, and Private Lurhs violated the MFD's social-media policy, unlike Private Boyd, none of them "published or depicted or referenced minors." The Commissioner also noted Private Boyd's previous disciplinary violations. Based on the evidence, the Commissioner upheld the termination of Private Boyd's employment, finding that Private Boyd "knew of the social media policy, violated the policy, had three (3) major violations in the past, two (2) of which were within the preceding four (4) years of this violation of the social media policy[, and] the violation of

- 5 -

the social media policy by others did not involve minor-sex overtones nor did those violations show [the violator] as a Memphis fireman."

On July 15, 2019, Private Boyd filed a petition for writ of certiorari in the Shelby County Chancery Court ("trial court"). The trial court later determined that Private Boyd's petition should proceed under the Uniform Administrative Procedures Act ("UAPA"), *see infra*. In his petition, Private Boyd argued, *inter alia*, that "the City of Memphis violated his equal protection rights when it applied its policy disparately towards him when a number of firefighters who committed numerous social media violations . . . were allowed to maintain their employment." Private Boyd also asserted that the City's decision was made in violation of Tennessee Code Annotated section 4-5-322(h), *infra*. By order of July 7, 2023, the trial court reversed the termination of Private Boyd's employment on its findings that the decision was arbitrary and capricious, and made in violation of Private Boyd's right to equal protection. The City and Commission appeal.

## II. Issues

Appellants raise the following issues for review as stated in their brief:

I. Whether the Chancery Court erred and abused its discretion in finding that the Civil Service Commission's decision upholding the termination of Fire Private Taurick Boyd was arbitrary and unreasonable?

II. Whether the Chancery Court erred in finding that the decision of the Civil Service Commission violated Private Boyd's equal protection rights, given that determination was made on factual findings not supported by evidence in the record?

III. Whether the Chancery Court erred and abused its discretion in not finding that substantial and material evidence supports the decision of the Civil Service Commission

## III. Standard of Review

Tennessee Code Annotated section 27-9-114(b)(1) provides that "[j]udicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322." The scope of the review is the same for the trial court and this Court. ***Davis v. Shelby Cnty. Sheriff's Dep't***, 278 S.W.3d 256, 264 (Tenn. 2009) (citing ***Gluck v. Civil Serv. Comm'n***, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999)). When reviewing a civil service board's decision, courts apply the standards for judicial review set out in the UAPA. ***Moss v. Shelby Cnty. Civ. Serv. Merit Bd.***, 597 S.W.3d 823, 830 (Tenn. 2020). Specifically,

Tennessee Code Annotated section 4-5-322(h) of the UAPA "contains the standard of judicial review that is used to review decisions of the City of Memphis Civil Service Commission." ***Davis v. City of Memphis***, No. W2016-00967-COA-R3-CV, 2017 WL 634780, at *3 (Tenn. Ct. App. Feb. 16, 2017) (citing ***City of Memphis v. Lesley***, No. W2012-01962-COA-R3-CV, 2013 WL 5532732, at *6 (Tenn. Ct. App. Oct. 7, 2013)).

Private Boyd received his termination letter on or about June 7, 2017. The version of the UAPA in effect at that time is applicable here. *See* ***Copeland v. Tenn. Dep't of Corr.***, No. M2021-01557-COA-R3-CV, 2022 WL 17368978, at *4 n. 5 (Tenn. Ct. App. Dec. 2, 2022). That version of the statute provides that:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) (A) Unsupported by evidence that is both substantial and material in the light of the entire record.
>
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h). "The reviewing court may reverse, remand, or modify a civil service board decision only for errors that affect the merits of the decision." ***Moss***, 597 S.W.3d at 830 (citing Tenn. Code Ann. § 4-5-322(i)).

As set out above, the statute cautions that, "[i]n determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Tenn. Code Ann. § 4-5-322(h)(5)(B). The statute further provides that, in reviewing the substantiality of the evidence, the reviewing court, "shall not substitute its judgment for that of the [Commission] as to the weight of the evidence on questions of fact." *Id*. Although what amounts to "substantial and material" evidence, as used in section 4-5-322(h)(5)(B), is not clearly defined, it is generally understood that it requires something less than a preponderance of the evidence, but more than a scintilla or a glimmer. ***Wayne Cty. v. Tennessee Solid Waste Disposed Control Bd.***,

756 S.W.2d 274, 280 (Tenn. Ct. App. 1988).

Although courts review an agency's decision with deference, this is no "excuse for judicial inertia." **Wayne Cty.**, 756 S.W.2d at 280. However, courts are not permitted to reverse an administrative decision that is supported by substantial and material evidence, "solely because the evidence could also support another result." **Mitchell v. Madison Cty. Sheriff's Dep't**, 325 S.W.3d 603, 619 (Tenn. Ct. App. 2010); **Marlin v. Sizemore**, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001) (citing **Hughes v. Bd. of Comm'rs**, 319 S.W.2d 481, 484 (Tenn. 1958); **Metro. Gov't v. Tenn. Solid Waste Disposal Control Bd.**, 832 S.W.2d 559, 561 (Tenn. Ct. App. 1991)). The Commissioner's factual findings may be rejected, "only if a reasonable person would necessarily draw a different conclusion from the record." **Mitchell**, 325 S.W.3d at 619 (citing **Jones v. Greene**, 946 S.W.2d 817, 828 (Tenn. Ct. App. 1996)) (internal citations omitted). As succinctly stated **in Watts v. Civil Service Bd. for Columbia**, 606 S.W.2d 274 (Tenn. 1980), *cert. denied*, 450 U.S. 983 (1981):

> In the trial court, under the common law writ, reversal or modification of the action of the Civil Service Board may be had only when the trial court finds that the Board has acted in violation of constitutional or statutory provisions or in excess of its own statutory authority; has followed unlawful procedure or been guilty of arbitrary or capricious action; or has acted without material evidence to support its decision. The trial court does not weigh the evidence. The scope of review by the appellate courts is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board.

**Watts**, 606 S.W.2d at 277.

## IV. Analysis

Section 103.01, paragraph 7 of the MFD Rules outlines a supervisor's responsibilities in deciding disciplinary actions involving MFD employees. As relevant here, the Rule provides:

> [A]n employee who commits a serious offense should receive immediate discipline. Supervisors should be aware of the degree of disciplinary action which is fair and consistent. The degree of discipline should be progressive in nature unless the offense dictates otherwise.
>
> The supervisor should consider the following factors:
>
> a. Seriousness of the violation.
> b. Mitigating circumstances, if any.

c. Length of service and previous record of the employee.
d. Reasonable consistency in applying similar penalties to similar offenses.
e. The prospect that disciplinary action may play a rehabilitative role.
f. Attitude and conduct of the employee throughout the investigation and personal interview.

Ordinarily discipline may be applied in a progressive fashion with more severe penalties following successive violations. This is particularly true when relatively minor offenses occur. However, the most significant consideration is for the penalty to be in proportion to the violation. Serious offenses may call for appropriately serious penalties.

The discipline process should follow progressive steps as defined in this manual. This does not mean that supervisors are limited to a reprimand as an initial step. Fairness and reason should be employed to [e]nsure that the action taken is properly suited to the offense committed.

Before deciding on any disciplinary action, all supervisors have the responsibility to review the employee's personnel file and do the necessary research to ensure that the disciplinary action is consistent with past practice. Appropriateness and fairness of the discipline must be considered before a final decision is made. Although each case may have mitigating circumstances, consistency in the issuance of discipline should be maintained for situations involving similar circumstances. Deviation from this practice should be limited to situations involving mitigating circumstances.

Here, Private Boyd maintains that the termination of his employment was arbitrary and capricious and was in violation of his right to equal protection because the MFD failed to follow its rules and imposed discipline disparately among similarly situated employees. Specifically, Private Boyd, who is African American, maintains that, while his employment was terminated, other Caucasian employees were not fired although they violated the MFD's social-media policies in ways similar to Private Boyd. As stated by Private Boyd's attorney during his opening statement before the Commissioner:

We don't dispute the fact that [Private] Boyd should be disciplined, we don't dispute the fact that he made a mistake. Our issue in this particular matter is that when you look at his 19 years, and you're going to hear testimony in here today of other firefighters that work for the Fire Department that have significantly worse discipline and are still on the job. You're going to hear testimony or evidence of other firefighters that have made significant racist comments and there was a significant outcry, and they still work for the Fire Department.

An arbitrary and capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion. *City of Memphis v. Civil Serv, Comm'n*, 216 S.W.3d 311 (Tenn. 2007); *Jackson Mobilphone Co., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106 (Tenn. Ct. App. 1993). A decision unsupported by substantial and material evidence is necessarily arbitrary and capricious. *Mitchell*, 325 S.W.3d at 504; *CF Indus, Inc. v. Tennessee Puh. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980) (holding that agency decisions not supported by substantial and material evidence are arbitrary and capricious). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept to support a rational conclusion" and to "furnish a reasonably sound basis for the decision under consideration." *Macon v. Shelby Cty. Gov. Civil Serv. Merit Bd.*, 309 S.W.3d 504, 508-509; *Penny v. City of Memphis*, 276 S.W.3d 410, 418 (Tenn. Ct. App. 2008) (citations omitted); *Mitchell*, 325 S.W.3d at 618; *Miller v. Civil Serv. Comm'n*, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008) (citing *City of Memphis v. Civil Serv. Comm.*, 216 S.W.3d 311, 316 (Tenn. 2007)).

Turning to the record before the Commissioner, in questioning Deputy Chief of Operations Kirk Lock, who presided over Private Boyd's administrative disciplinary hearing, Private Boyd's attorney reiterated the requirements of section 103.01, paragraph 7 of the MFD Rules, *supra*, including "the responsibility to. . . [e]nsure that the disciplinary action is consistent with past practice" so as to maintain the "[a]ppropriateness and fairness of the discipline," and "consistency in the issuance of discipline . . . for situations involving similar circumstances." Deputy Chief Lock acknowledged that he was required to consider previous disciplinary actions under MFD Rule 103.01:

> Q. According to this policy, aren't you required to determine, to check all social media violations—people who are violating the social media policy, aren't you required to do that?
> A. We are.

Although Deputy Chief Lock acknowledged that MFD Rule 103.01 required him to consider Lieutenant Kramer's discipline when recommending Private Boyd's discipline, there is some question as to whether Deputy Chief Lock actually reviewed Lieutenant Kramer's file prior to participating in Private Boyd's hearing:

> Q. So he [Lieutenant Kramer] made—in your opinion, he made three inappropriate comments, two of those three were at least racist or racial?
> A. Yes.
> Q. Okay. Then didn't he make a comment also about a city counsel member?
> A. I would have to read it [*i.e.,* Lieutenant Kramer's disciplinary report] and find out; I really don't know.
> Q. Now, you scare me when you say you don't know, Chief, because when I look at [MFD Rule] 103.01, I assume that you are supposed to consider

- 10 -

similar discipline; would you agree with me on that?

A. I do, but I wasn't part of this hearing.

Q. No, no. I'm sorry. I agree with that. But you were part of [Private] Boyd's hearing; would you agree with that?

A. That is correct.

Q. And you are supposed to consider similar discipline throughout the Fire Department in your hearing; would you agree with that?

A. That is correct.

Q. And this is the type of stuff that you were supposed to consider. Wouldn't you agree with that?

A. Yes, but I didn't memorize the whole letter, everything in it.

Q. Well, familiarize yourself with it, Chief, and let me know when you're ready.

A. I'm ready.

After reviewing Lieutenant Kramer's disciplinary file, Deputy Chief Lock testified:

Q. Okay. There are people who currently work in the Fire Department that have made racial comments on social media, correct?

A. I'm sure there is.

Q. Okay. And there was significant media outcry when they made racial comments on social media, correct?

A. Yes.

Q, Okay. So this is not the first time where we had a situation where there was a significant media outcry for people on social media, correct?

Q. Correct.

Q, Do you know Lieutenant Kramer?

A. I do. . . . He is no longer with the department.

Q. Okay. At one point he was a lieutenant though, wasn't he?

A. That is correct.

Q, And he got disciplined numerous times, correct?

A. Yes.

Q. And in fact he was demoted from lieutenant to driver?

A. That is correct.

Q. And after he was a driver he was disciplined some more, right?

A. That is correct.

Q. Okay. So he was demoted. Do you know how many times that Mr. Kramer, Lieutenant Kramer, was disciplined?

A. I do not.

Q. More than once though, right?

A. Yes.

Q. More than twice?

A. Yes.

- 11 -

Q. More than three times?
A. I would say so.
Q. Okay. Now, after he got disciplined, after he was demoted from lieutenant to driver he was disciplined for social media violations, wasn't he?
A. He was.
Q. Okay. And in fact he made racial comments on social media, didn't he?
A. Yes.
Q. Okay. I'm going to show you a document. And, Chief, what I'm handing to you is what I think is one of the—it's not the most recent discipline, because Kramer wasn't terminated for his social media violations, correct?
A. He was not.
Q. Now, he wasn't terminated, right? He retired.

In the first instance, like Private Boyd, Lieutenant Kramer had a history of at least three prior disciplinary actions. In its order, the Commissioner stated that Private "Boyd has committed a major violation of MFD and/or City policy bringing serious violations to four (4) [*i.e.,* we read "serious violations to four (4)" as a reference to Private Boyd's 3 previous violations and the instant violation]. The three (3) firemen to whom Boyd compares himself do not have comparable work histories." From our review, Lieutenant Kramer also had previous violations. According to Lieutenant Kramer's suspension letter, which was admitted as Exhibit 13, Lieutenant Kramer's "personnel record contains several disciplinary actions including suspensions; one of a similar nature in which [he was] previously issued a (4) hour [suspension] . . . for making a written comment of disparaging nature in reference to the Shelby County Government." Although the disciplinary letter specifies only one of the previous 4 disciplinary proceedings against Lieutenant Kramer, the Commissioner held that the other firefighters' "previous disciplines [were not] as serious as Boyd['s]." However, the Commissioner failed to explain the basis of his conclusion and did not discuss the other firefighters' specific disciplinary violations or compare those to Private Boyd's. In short, there is no basis for Commissioner's finding that "previous disciplines [were not] as serious as Boyd's."

Deputy Chief Lock further testified that Lieutenant Kramer's social-media violation was similar to Private Boyd's:

Q. Isn't Kramer's conduct a violation of 30.01?
A. Yes, I would guess so.
Q. Okay. So even though he wasn't charged with it, he still violated those same polices, right?
A. Correct.
Q. Okay. So you would agree with me that every policy that Boyd violated Kramer violated, even though he wasn't charged with it. Wouldn't you agree with that?
A. I would have to look at them to make sure.

- 12 -

Q. Just off the top of your head though?
A. I would think so.

Concerning Private Luhrs' violation of the MFD's social-media policy, Deputy Chief Lock testified that it was "racist" and "inappropriate":

Q. Chief, I just handed to you another document. Can you tell me what that document is?
A. It's a suspension letter for Christopher Luhrs.
Q. And is this document involving the City of Memphis social media policy?
A. Yes, it was.

***

Q. So now according to Exhibit No. 18, Private Luhrs posted something on the news media's Facebook page, right?
A. He did.
Q. Okay. Did you consider this inappropriate?
A. I did.
Q. Did you consider this to be racist?
A. I did.

***

Q. . . . [H]e didn't get terminated as a result of this comment, right?
A. No.

Turning to Lieutenant Tolliver's disciplinary action, Deputy Chief Lock testified:

Q. What did [Lieutenant Tolliver] do?
A. He e-mailed it to one of his employees.
Q. So he e-mailed a picture of a minor to one of his employees?
A. He did.
Q. And what did that employee do?
A. The employee posted it [on social media],
Q. So he e-mailed a picture of a minor to an employee and that employee posted it?
A. That's correct.
Q. By taking a picture of a minor, isn't that a violation of the Memphis Fire Department policy?
A. Yes.
Q. By taking a picture of a minor and e-mailing it to somebody, is that a violation of the City of Memphis policy?

- 13 -

A. I don't know the full context of the e-mail.
Q. Okay. I like that. But giving it to your employee and your employee posting it, isn't that a violation of the City of Memphis policy?
A. The employee posting it is a violation, yes.
Q. Were either of these gentleman terminated?
A. No.

As was the case with Private Boyd, Lieutenant Tolliver's dissemination of the offensive photo was first made through private means, *i.e.*, Lieutenant Tolliver sent the photo to another employee by email, and Private Boyd posted the offensive meme in a private chatroom. Both of the photos were later posted to social media by third parties. The Memphis Police Department Inspection Services Bureau ("ISB") report, admitted as Exhibit 3, states that Private Boyd "posted inappropriate content on a Facebook uncensored site that was shared to his personal Facebook page." In his "Principle Officer Statement," which was taken in connection with the ISB investigation, Private Boyd explained:

> The difference [between Pettyville and Facebook] is when you go into . . . a private room [*i.e.*, Pettyville], it's pretty much everything that . . . goes [on] in that room stay[s] in that room, and it's . . . noted . . . even before you come in [to the private online room] because [there are] some things . . . that you don't mind posting in this private room that you don't want on your public [Facebook] page so you post[] in a private room . . . .

Concerning how the offensive posting came to be on Private Boyd's public Facebook page, he stated:

> [T]his is what somebody did. They screenshot what was in a private room, was supposed to stay in this private room. They screenshot that and start[ed] . . . sharing it to everyone, who they can think of, of my [Facebook] friends. . . . They . . . screenshot . . . [and] just start[ed] sharing it . . . and once it started sharing . . . then whoever I'm friends with can share it to my page . . . . Yeah so when they started sharing, when they started sharing it all out and then that's when . . . my Lieutenant call[ed] and said Taurick did you share . . . a post? I said yeah I shared a post but it was in a private room.

Indeed, according to Sergeant Calvin Austin, who conducted the ISB investigation, there is indication that a private citizen, April N., who also reported Private Boyd's post to the media and the MFD, may have been the person who posted the offensive meme to Private Boyd's public Facebook. Concerning the fact that the offensive meme came to Private Boyd's public Facebook page by repost, during Private Boyd's attorney's cross-examination of Sergeant Austin, the City's attorney objected to a line of questioning, and the following interchange ensued:

- 14 -

[MS. PETTY, attorney for the City]: I don't see what that's got to do with this case whatsoever. There is no dispute that [Private] Boyd posted this [meme] on Facebook, where it originated is irrelevant; he posted it.

MR. O'NEAL [attorney for Private Boyd]: Okay. So is the City going to concede that it's a repost?

MS. PETTY: I'm certainly not going to urge that he created that photograph, but he posted it?

MR. O'NEAL: Okay. That's where I'm going. I need somebody to say that this is a repost.

MS. PETTY: I have no evidence that it was not.

Although the City conceded that the meme was a repost, the Commissioner did not acknowledge the fact that Private Boyd never intended the post to be public. Furthermore, Deputy Chief Lock opined that, in Lieutenant Tolliver's case, the "employee posting [the photo of the minor on Lieutenant Tolliver's Facebook page] is [in] violation [of the MFD policy]." However, in Private Boyd's case, Deputy Chief Lock appears to ignore the fact that Private Boyd did not publish the offending meme on a public site. Rather, it was posted by a third party.

The Commissioner's order states that Private Boyd "alleges that [] Lieutenant Kramer, [] Lieutenant Tolliver and [] Private Luhrs received multiple disciplines and violated the social media policy yet were not terminated. The citations to the record by Boyd do not support these averments. (Tr. 43:13-15; 483-5; 60:24-25; 61; 1-2; 62:4-25;68; 16-19;70:19-21 et cetera)." As referenced by the Commissioner, the "citations to the record," are citations to Deputy Chief Lock's testimony. Contrary to the Commissioner's conclusion, Deputy Chief Lock's relevant testimony, as set out in context above, does support Private Boyd's averments. Nonetheless, the Commissioner attempts to distinguish the actions of Lieutenant Kramer, Lieutenant Tolliver, and Private Luhrs from those of Private Boyd. Specifically, the Commissioner's order states that "none of these three (3) fireman published or depicted or referenced minors." In the first instance, this is not true. Lieutenant Tolliver sent his employee a photo of a child, who suffered a fall through a ceiling that resulted in the child having a nail (attached to a board) puncture his head. Nonetheless, as the Commissioner explains, the other firefighters' posts "were not minor-sexual in nature." This is true, but they were racist, disparaging, or made without respect to a minor child's privacy.

Despite their bad judgment, all the other firefighters cooperated in their respective investigations, conceded that their actions were offensive, issued public apologies, and removed the offensive postings. Private Boyd did all of these things as well. Nonetheless, Deputy Chief Lock opined that, during the course of his investigation of Private Boyd, Private Boyd's "attitude was cavalier. He didn't take it seriously." During his testimony, Private Boyd disputed Deputy Chief Lock's statements:

- 15 -

Q [to Private Boyd]. And I think [Deputy Chief Lock] was insinuating that you didn't take this seriously. Did you insinuate that to him?

A. No, I did not.

Q. At any point during that conversation with the police officer did you evade any of his questions?

A. No, I was being truthful and upcoming [sic] about everything.

Q. Did you tell him that you had—did you apologize? What did you tell him in regards to how you felt?

A. I told them that I—first of all, I never thought that it would come to this. From it being a joke. And I am really hurt that I offended so many people during that time, and I just never thought it would come this far from being a joke.

Q. When you met with the Fire Department, what were the conversations that you were having with them about—because I think Chief Lock said . . . that you didn't—it didn't appear that you were sorry.

A. I don't know why Chief would think that even during that time.

Q. What is that?

A. Because I apologized, you know.

Q. Can you think of anything else you could have done to show that you were sorry?

A. I deleted my [Facebook] page.

***

Q. Okay. What else?

A. Other than apologizing to the group, other than deleting my page, de-activating Facebook, I mean, I don't know anything else that I can do.

In truth, each of these firefighters, Lieutenant Kramer, Lieutenant Tolliver, Private Luhrs, and Private Boyd posted photos, statements, or memes that were offensive and in clear violation of MFD's policies. These postings caused uproar in the community and resulted in negative press against the MFD. Like Private Boyd, Lieutenant Kramer had numerous previous policy violations. Like Private Boyd, Lieutenant Tolliver's offensive photo was published to Facebook by a third-party. Like Private Boyd, Lieutenant Kramer, Lieutenant Tolliver, and Private Luhrs cooperated in their respective investigations, acknowledged that their respective actions were inappropriate, and issued apologies. Yet, only Private Boyd's employment was terminated. As conceded by Deputy Chief Lock:

Q. . . . [S]ince the social media policy has been in effect, other than [Private] Boyd has anybody been terminated for violating the social media policy?

A. Not that I'm aware of.

Q. Okay. So no one has been terminated other than [Private] Boyd for violating the social media policy; is that correct?

- 16 -

A. As far as I know, yes.

After reviewing the entire record before the Commission, we are concerned that MFD Rule 103.01 was not followed in Private Boyd's case. As set out in context above, MFD Rule 103.01 required the MFD to implement a degree of discipline that was "fair and consistent," and "progressive in nature unless the offense dictates otherwise." Although the Commissioner's order notes that "[t]he three(3) firemen to whom Boyd compares himself do not have comparable work histories," the evidence discussed above shows that Lieutenant Kramer, Lieutenant Tolliver, and Private Lurhs did have similar work histories and similar disciplinary actions. MFD Rule 103.01, also requires consideration of "mitigating circumstances"; like Lieutenant Tolliver, Private Boyd's offensive post was made public by a third party. The Commissioner did not consider this fact. The MFD is further charged with consideration of the "length of service and previous record of the employee." As discussed above, both Private Boyd and Lieutenant Kramer had previous disciplinary actions, but the Commissioner's order merely states that "other violations were not minor-sexual in nature nor were previous disciplines as serious as Boyd." However, the Commissioner does not analyze Lieutenant Kramer's previous disciplinary actions against Private Boyd's. The Rule also requires consideration of the "[a]ttitude and conduct of the employee throughout the investigation and personal interview." Although Deputy Chief Lock described Private Boyd's attitude as cavalier and dismissive, it is undisputed that Private Boyd took down the offending post, issued a public apology, and cooperated fully in the investigation—just as Lieutenant Kramer, Lieutenant Tolliver, and Private Lurhs did. In short, the Commissioner's finding that Private Boyd and the other three firefighters are not similarly situated is "[u]nsupported by evidence that is both substantial and material in the light of the entire record." Tenn. Code Ann. § 4-5-322(h)(5)(A).

Finally, MFD Rule 103.01 requires "[r]easonabl[e] consistency in applying similar penalties to similar offenses." To this end, "[b]efore deciding on any disciplinary action," MFD supervisors are required to review the employee's personnel file and do the necessary research to ensure that the disciplinary action is consistent with past practice. Here, there is some question as to whether Deputy Chief Lock reviewed Lieutenant Kramer's file. Regardless, the Commissioner made no finding that Private Boyd's discipline was reasonably consistent with the discipline meted to the other three similarly situated firefighters. Because "[a]ppropriateness and fairness of the discipline must be considered before a final decision is made" the Commissioner's failure to address the question of consistency negates its order insofar as the order was "[m]ade upon unlawful procedure." Tenn. Code Ann. § 4-5-322(h)(3). We do not go so far as the trial court to definitively conclude that termination of Private Boyd's employment was unwarranted. Rather, based on our determination that the Commissioner failed to consider all relevant requirements of MFD 103.01, we vacate its order and remand for reconsideration. *Moss*, 597 S.W.3d at 830 (citing Tenn. Code Ann. § 4-5-322(i)) ("The reviewing court may . . . remand . . . a civil service board decision . . . for errors that affect the merits of the decision.").

- 17 -

## V. Conclusion

For the foregoing reasons, the trial court's order is vacated. The case is remanded to the trial court for entry of an order vacating the Commission's decision and remanding to the Commission for further proceedings consistent with this opinion. Costs of the appeal are assessed one-half to the Appellants, City of Memphis and City of Memphis Civil Service Commission, and one-half to Appellee, Taurick Boyd. Execution for costs may issue if necessary.


s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE